IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HILTON MINCY,                    :    CIVIL ACTION NO. 1:05-CV-0292
                                 :
              Plaintiff          :    (Judge Conner)
                                 :
      v.                         :
                                 :
KENNETH G. CHMIELEWSKI,          :
et al.,                          :
                                 :
              Defendants         :

## MEMORANDUM

Presently before the court is defendants' motion for summary judgment

pursuant to FED. R. CIV. P. 56. (Doc. 94). In his amended complaint (Doc. 21),

plaintiff Hilton Mincy ("Mincy") alleges violations of the First, Eighth, and

Fourteenth Amendments to the United States Constitution under theories of

retaliation, unconstitutional conditions of confinement, due process, and conspiracy

against Pennsylvania Department of Corrections defendants Chmielewski, Mooney,

Gavin, Kane, Kramer, Joffe, Kehoe, Everding, Clark, Renninger, Breiner, Morgan,

Vance, Murphy, Lapatovich, Gower, Lowe, Avellino, Derfler, Kaufman, Rutecki,

Bitner, Klem, and Ahner. Mincy has agreed to an entry of summary judgment in

favor of defendants Kehoe, Kramer and Ahner.[1] (Doc. 124-11, p. 2). In addition,

Mincy acknowledges that he has failed to set forth a viable conspiracy theory (Doc.

---

[1]Although Defendant Ahner was never served, Mincy agreed to dismiss the
claim against this defendant. (Doc. 124-11, p. 2).

134, p. 31).  Therefore, all defendants will be granted summary judgment on the conspiracy claim.

For the reasons set forth below, the motion for summary judgment will also be granted with respect to the remaining claims.

## I.    <u>Statement of Facts</u>

Mincy, at all times relevant, was an inmate at the State Correctional Institution at Mahanoy ("SCI-Mahanoy").  On November 10, 2004, Mincy's cellmate, Willie Young ("Young"), was involved in a physical altercation with Officer James Kehoe (hereinafter referred to as the "Young/Kehoe incident").  An investigation was conducted by the security office.  The investigative role of Lieutenant Gavin ("Lt. Gavin") and his supervisor, Captain Mooney, was to insure that appropriate documentation was completed by staff, submitted to the superintendent for his approval and then forwarded to the Pennsylvania State Police.  (Doc. 124-12, p. 11). In an effort to "assure that the incident as it was reported on the date of the incident and was presumed to be an isolated incident, whereas one inmate assaulted one staff member and it wasn't a coordinated thing, and there was no larger problems as far as a group activity or anything," on November 12, 2004, Lt. Gavin chose to interview Mincy because he was Young's cellmate.  (<u>Id</u>. at p. 15; Doc. 21, p. 3).  Mincy initially objected.  However, upon being assured by Lt. Gavin that he would not be charged criminally, Mincy gave a statement in which he asserted that Officer Kehoe "may have" referred to inmate Young as a homosexual which led inexorably to a physical altercation.  (<u>Id</u>. at pp. 17, 18).

2

Mincy forwarded correspondence dated November 12, 2004, and November 13, 2004, to the Pennsylvania Department of Corrections Office of Professional Responsibility, and to the Pennsylvania Prison Society, concerning the Young/Kehoe incident and his interview in the security office.  (Doc. 131-7, pp. 2, 3). Mincy expressed concerns that inmate Young had been brutally beaten by prison staff following the incident.

When Officer Kehoe was scheduled to return to work[2], the unit manager telephoned Lt. Gavin to inquire as to whether it was "a good idea to have Mincy and Officer Kehoe on the same unit, or should we transfer him?"  (Doc. 124-12, p. 29). Although Mincy was not directly involved in the Young/Kehoe incident, Lt. Gavin felt that it was in Mincy's best interest not to be on the same housing unit with Officer Kehoe in light of Mincy's statement to investigators and Mincy's potential sensitivity and volatility in interacting with Officer Kehoe.  Id.  Mincy was informed on November 23, 2004, that he would be moved from the housing unit.  In response, he filed Grievance Number 102459 charging that the move was in retaliation for providing information about the Young/Kehoe incident and amounted to harassment.  (Doc. 124-5, p. 226).  Further, the move would result in the loss of his block job, loss of wages and loss of prepaid cable.  (Id.).  Lt. Gavin responded as follows:

_____

[2]The record is devoid of any details concerning the reason for, or length of, Kehoe's absence from work.

3

> Your housing unit move from E Unit to D Unit was based on the security needs of the institution.  As you are well aware you have and continue to be involved in an ongoing criminal investigation.  This investigation involves an assault on staff perpetrated by your prior cellmate.  Your move from the unit the assault occurred on will only serve to enhance the security of the institution.
>
> Your assertion that you were moved because you would not change your version of the events that occurred during the assault on staff are baseless.  Your statements to me have been forwarded to the PA State Police who are continuing their investigation into the staff assault.  At no time did I nor will I ever ask you to change your statement.
>
> Your request to transfer to another institution should be directed through your unit team, not a grievance.  As you were not directly involved in the incident that precipitated your housing unit move and there is no evidence of any type of retaliation, I would <u>not</u> recommend a transfer at this time.  If circumstances change the transfer request will be revisited.

(Doc. 124-5, p. 8).  The grievance was appealed to Superintendent Klem who reiterated that the move was taken as a security measure and that his statement was forwarded to the Pennsylvania State Police.  (<u>Id</u>. at p. 11).   His appeal to final review was denied.  The Chief Grievance Officer stated that "[y]our claim that you were moved to another housing unit because you would not change your 'story' is without merit.  I find that your issues have been thoroughly addressed and [you] have been moved to another unit based on the security needs of the institution." (<u>Id</u>. at p. 5).

Mincy contends that following the writing of the letters and the filing of the grievance, he was subjected to constant cell searches and "pat down" searches.  He also alleges that an investigative cell search was conducted the morning after the

4

Young/Kehoe incident.  (Doc. 21, p. 2, ¶¶ 4, 5).  In accordance with Department of

Corrections Administrative Directive ("DC-ADM") 203, "[a] cell search may be

conducted as part of a general search, randomly selected or as needed as part of an

investigation."  (Doc. 126-4, p. 4).  A showing of reasonable suspicion or probable

cause is not necessary for general or random searches.  (Id. at p. 5).  However,

reasonable suspicion is necessary for an investigative search.  (Id.).  With regard to

a search of an inmate's person, "[e]very inmate is subject to search at any time.

Staff personnel of either gender may conduct pat searches in any area of the

facility.  They will be conducted in a professional manner with tact and proper

attitude displayed."  (Id. at p. 7).

Mincy was removed from his housing unit on November 27, 2004, the day

Officer Kehoe was scheduled to return to work, and placed in administrative

custody.[3]  (Doc. 124-2; Doc. 126-1, p. 7, ¶18).  On the same day he was transferred to

AC status, he was charged by Officer Breiner with Misconduct No. A552267 for

refusing to obey an order and failure to stand count or interference with count.

(Doc. 124-4, p. 22).  Officer Breiner states that on November 27, 2004, he was

conducting a security tour of the RHU pods and that Mincy had draped his blanket

over the front of his bed and crawled under his bed, concealing himself.  (Doc. 124-

---

[3]"Administrative Custody (AC) is a status of confinement for non-disciplinary
reasons that provides closer supervision, control and protection than is provided in
general population."  (Doc. 126-1, p. 6, ¶ 15) (citing DC-ADM 802, p. 1).  "An inmate
may be placed in AC status if his presence in general population would constitute a
threat to staff or the secure or orderly running of a correctional facility."  (Id. at ¶
16) (citing DC-ADM 802, p. 2, Section VI, A1).

8, p. 3, ¶¶ 6, 8).  The officer knocked loudly several times on his cell door and called

out for him to show himself.  Mincy refused to answer or show himself.   Shortly

thereafter, Officer Breiner was conducting a count tour and Mincy again refused his

order to show himself.  (Id. at p. 4, ¶ 15).  Based on this conduct, the officer wrote

Misconduct No. A552267.

In preparing for the misconduct hearing, Mincy contends that Officers Vance

and Murphy refused to assist him in submitting the witness form.  The hearing was

held on December 3, 2004.  The findings of fact, verdict and sanctions imposed by

Hearing Officer Kane are as follows:

> Inmate pleads not guilty to both charges and submits a version but
> no witness form.  He claims to have submitted a witness form, but
> did not retain his copy of it.  Neither I, nor the recorder have his
> witness form.  Therefore, no witness will be called due to the
> untimely request for them.
>
> States that he was asleep when the officer came around and heard
> no orders given to him.  He also states that at the time, he was
> asleep but not fully covered up.
>
> I find for the staff's report over the inmate's denial that he was
> ordered to show himself to the officer when the officer was taking
> count and he refused, interfering with the officers' [sic] count.  I
> don't find his statement of being asleep and knowing he was not
> covered up completely very credible.  I find him guilty of both
> charges.
>
> Sanction: 60 days D.C. eff. 11-27-04 thru 1-25-05.

((Doc. 124-4, p. 24).  Mincy unsuccessfully appealed the decision of Hearing Officer

Kane to final review.  (Doc. 124-4).  However, on the same day he commenced the

misconduct appeal process, he filed a grievance alleging that Officer Murphy

refused to take his misconduct witness form and that Officer Vance would not sign

the form because it was turned in late. (Doc. 124-5, p. 14). Based upon Officer

Vance's contention that he actually received the witness form, but then forwarded it

to "Control" per standard procedure, Superintendent Klem sustained the grievance

and directed Hearing Officer Kane to rehear the misconduct. (Doc. 124-5, p. 15).

The rehearing took place on January 21, 2005. (Doc. 124-4, p. 16). Hearing

Officer Kane found as follows:

> This is a rehearing remanded back by the superintendent.
>
> Inmate pleads not guilty and submits a witness form, but no version form.
>
> States that his report should be dismissed due [to] the hearing being held past 7 working days of the notice for a rehearing. Then he states that he was not covered nor blocking the officer's view. He was never given any orders.
>
> As to his claim of an untimely hearing, it is being held after the recorded [sic] was given notice, thru the mail, and after Mincy was given a witness form and given time to submit it. There is no documentation in the 801 that covers the time table for a rehearing. I find no violation and the report stands as is.
>
> I find for the officer's report over the inmate's denial that he was ordered by the officer to show himself and he did refuse, interfering with the officer's count. I find him guilty of both charges.

(Doc. 124-4, p. 16). He was sanctioned with fifty-four days of disciplinary

confinement in the restricted housing unit ("RHU"). (Id.). Mincy appealed the

decision through all levels of review. At each level, it was concluded that there was

no reason to disturb the hearing officer's decision. (Doc. 124-4, pp. 2, 3).

On December 1, 2004, shortly after his arrival in the RHU, Mincy was admitted by Dr. Modery as an inpatient to the infirmary for psychiatric observation with a preliminary diagnosis of refusing to eat. (Doc. 124-6, p. 3, ¶ 8). The policies regarding placement in psychiatric observation due to intentional forbearance from eating and/or drinking is as follows:

> When staff observe that an inmate is refusing to drink liquids for 24 hours and/or eat for 72 hours, or sometimes earlier, the staff member notifies the shift commander.
>
> The shift commander notifies a variety of personnel, including the medical department and the inmate's assigned psychology staff member.
>
> Dr. Marsha Modery admitted Mincy as an inpatient to the infirmary for psychiatric observation on December 1, 2004 with a provisional diagnosis of refusing to eat.
>
> Inmates refusing to eat and to take liquids ("hunger strike") are place placed [sic] in psychiatric observation for their own safety.

(Doc. 123, p. 18, ¶¶ 93-96). The psychiatric observation cell ("POC") is equipped with a cot, but there is no running water so that medical staff can monitor fluid intake. (Doc. 124-6, p. 3, ¶¶ 9, 10). In addition, all inmates placed in a POC are given a safety vest to wear. (Id. at ¶ 11). No other clothing is permitted. (Id.) Mincy was given a safety vest upon placement in the POC. He was seen by Psychologist Lorraine Kramer on the date of admission. Mincy reported that he had refused to eat for several days because he was being denied privileges in the RHU. (See Mincy v. Klem, Civil Action No. 05-1458, Doc. 60-2, pp. 14, 18). However, indicated that he had eaten lunch and that he would continue to eat. (Doc. 124-6, p. 5, ¶ 20).

8

Psychologist Kramer found Mincy to be in stable condition without evidence of gross psychopathology.  (Id.)  He was counseled and signed a form on the effects of starvation and dehydration.  (Doc. 124-6, p. 6, ¶ 23; See Mincy v. Klem, Civil Action No. 05-1458, Doc. 60-2, p. 25).  As promised, Mincy ate all his meals while in the infirmary.  (Doc. 12-6, p. 6, ¶ 25).  He was discharged the following day.  (Id. at ¶ 24).

On December 7, 2004, Mincy filed Grievance Number 103968 alleging that certain officers in the RHU retaliated against him by refusing to provide him basic items from November 27, 2004, until approximately 9:00 a.m. on November 30, 2004, which prevented him from being able to shower.  (Doc. 124-5, p. 21).  Specifically, he did not have a towel, toilet paper, soap, toothpaste, or a toothbrush.  (Id.).  Inmate workers pre-pack initial issue bags that contain a roll of toilet paper, soap, toothpaste, toothbrush, comb, a flex pen, writing paper and envelopes and are given to every new RHU reception inmate.  (Doc. 124-7, p. 3, ¶¶ 5, 6, 8).  Towels, sheets and a blanket are issued by the Pod Officer.  (Id. at ¶ 9).  Mincy admits that he was offered showers, but he refused because he was denied soap and a washcloth.  (Doc. 131-1, p. 17, ¶ 123).  He also admits that he was eventually provided the items.  (Id. at p. 17, ¶ 133).  The grievance officer found that Mincy was given the required items and denied the grievance.  (Doc. 124-5, p. 23).  The grievance was unsuccessfully appealed to final review.  (Doc. 124-5, pp. 19, 25).

## II.    **Standard of Review**

"Summary judgment serves as a minimal but important hurdle for litigants to overcome before presenting a claim to a jury."  Pappas v. City of Lebanon, 331 F.

Supp. 2d 311, 314 (M.D. Pa. 2004).  Faced with such a motion, the adverse party

must produce affirmative evidence, beyond the disputed allegations of the

pleadings, in support of the claim.   FED. R. CIV. P. 56(e); see Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23 (1986); Corneal v. Jackson Township, 313 F. Supp. 2d

457, 464 (M.D. Pa. 2003), aff'd, 94 Fed. Appx. 76 (3d Cir. 2004).  "Such affirmative

evidence--regardless of whether it is direct or circumstantial--must amount to more

than a scintilla, but may amount to less (in the evaluation of the court) than a

preponderance." Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001)

(quoting Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir. 1989).

Only if this burden is met can the cause of action proceed.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. V. Zenith Radio

Corp., 475 U.S. 574, 587-89 (1986); see FED. R. CIV. P.  56(c), (e).

## III.   **Discussion**

Section 1983 of Title 42 of the United States Code offers private citizens a

cause of action for violations of federal law by state officials.  See 42 U.S.C. § 1983.

The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress. . . .

Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To establish a civil rights claim, the plaintiff must show a "deprivation" of a constitutional or statutory right by a person "acting under color of state law."  Id. (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

A.    First Amendment Retaliation

The First Amendment offers protection for a wide variety of expressive activities.  See U.S. Const. amend I.  These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct.  See Turner v. Safley, 482 U.S. 78, 89 (1987).

Retaliation for expressive activities can infringe upon an individual's rights under the First Amendment.  See Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000).  To prevail on a retaliation claim under 42 U.S.C. § 1983, plaintiff must demonstrate (1) that he was engaged in protected activity; (2) that he suffered an "adverse action" by government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him."  Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001) (quoting Allah, 229 F.3d at 225).

"As a threshold matter, a prisoner-plaintiff in a retaliation case must prove that the conduct which led to the alleged retaliation was constitutionally protected." Rauser, 241 F.3d at 333; see also, Jerry v. Williamson, 2006 WL 3741840, 1 (3d Cir.

2006).  While inmates "do not forfeit all constitutional protections by reason of their conviction and confinement including those under the First Amendment . . . , lawful incarceration brings about withdrawal or limitation of privileges and rights for various reasons, including institutional security."  Cooper v. Tard, 855 F.2d 125, 128 (3d Cir. 1988); see also, Pell v. Procunier, 417 U.S. 817, 822 (1974) (stating that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system").

Mincy contends that his filing of a grievance (No. 102459) and his correspondence (Doc. 131-7, pp. 2, 3) to the Pennsylvania Department of Corrections Office of Professional Responsibility and the Pennsylvania Prison Society concerning the Young/Kehoe incident constituted protected conduct for retaliation purposes.  The court agrees.  The filing of a grievance clearly falls within the ambit of the First Amendment.  See Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003).  It also is clear that prisoners retain a constitutionally protected right to reasonable correspondence with the outside world.  See Procunier v. Martinez, 416 U.S. 396, 418 (1974), overruled on other grounds, 490 U.S. 401 (1989).  His correspondence can therefore be considered protected conduct.

The remaining elements, that he suffered an "adverse action" by government officials, and that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him, will be discussed below in the context of the specific claims.

1.    Transfer to Administrative Custody

Mincy contends that his transfer to administrative custody was in retaliation for engaging in the above protected conduct.  To succeed on this claim, Mincy must establish whether his transfer to AC is sufficiently "adverse" to constitute constitutionally  cognizable infringements.  Official actions are considered "adverse" if they would  be "sufficient to deter a person of ordinary firmness from exercising his First  Amendment rights." <u>Allah</u>, 229 F.3d at 225.  Transfer to administrative segregation is sufficient to deter a person of ordinary firmness from exercising his constitutional rights.  <u>Atkinson v. Taylor</u>, 316 F.3d 257, 270 (3d Cir.2003)(holding that the prison officials were not entitled to qualified immunity when the plaintiff alleged that they retaliated against him by, *inter alia*, placing him in administrative segregation for the grievances he filed complaining about exposure to Environmental Tobacco Smoke).  Hence, the court finds that Mincy has satisfied the second element of a retaliation claim.

The third component of a retaliation claim requires the prisoner to show "a causal link between the exercise of his constitutional rights and the adverse action taken against him." <u>Rauser</u>, 241 F.3d at 333.  To demonstrate this link, the prisoner must prove that his constitutionally protected conduct was "a substantial or motivating factor" in the decision to discipline him.  <u>Id</u>. (citing <u>Mount Healthy Bd. of Ed. v. Doyle</u>, 429 U.S. 274, 287 (1977)).  Mincy fails to satisfy this component for several reasons.  First, the letters he wrote were mailed to the Office of Professional Responsibility for the Pennsylvania Department of Corrections in Camp Hill,

13

Pennsylvania and the Pennsylvania Prison Project located in Hatfield, Pennsylvania, organizations located outside the prison. Significantly, there is nothing in the record that indicates that the defendants knew that Mincy sent the letters, let alone had knowledge of their contents. Nor can he rely on the grievance he filed to establish causation. According to the evidence of record, although he was not moved from the block until November 27, 2004, he was informed of the move on November 23, 2004. On that same date, he filed Grievance Number 102459 charging that the move was in retaliation for providing information about the Young/Kehoe incident. (Doc. 124-5, p. 7). In the absence of evidence that the letters were the cause of the decision to move Mincy to AC, defendants are entitled to an entry of summary judgment.

Even if he met the requisite elements, defendants would still be entitled to an entry of summary judgment. Once the elements are met, the burden shifts to the defendant to prove by a preponderance of the evidence that the same action would have been taken even in the absence of the protected activity. <u>Id</u>. (quoting <u>Mount Healthy Bd. of Ed.</u>, 429 U.S. at 278). Because of the "deference" courts should afford prison officials, "prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." <u>Rauser</u>, 241 F.3d at 334. Defendants have established that the same action would have been taken in the absence of the protected activity for reasons related to the security of the institution.

2.      Searches of Mincy's Cell and Person

Mincy argues that he was subjected to frequent cell searches and searches of

his person following the exercise of his First Amendment rights.  (Doc. 134, p. 128).

Upon review, the court finds that Mincy is unable to establish that he suffered an

"adverse action."  As stated above, an adverse action is one sufficient to deter a

person of ordinary firmness from exercising his First Amendment rights.  However,

because general and random cell searches, as well as searches of an inmate's

person, can occur at any time, such an intrusion would not deter an inmate of

ordinary firmness from exercising his First Amendment rights.  Mincy also

references an investigative search which allegedly took place on November 11, 2004,

the morning after the Young/Kehoe incident.  (Doc. 21, p. 2, ¶ 4; Doc. 134, p. 28).

Notably, there is no evidence that such a search took place, or that Mincy was the

focus of the investigation.  Further, even if Mincy established that such an adverse

action occurred, the claim would still fail because he is unable to establish

causation.  It is undisputed that he engaged in the protected conduct on or after

November 12, 2004, after the date of the alleged adverse action.  Defendants are,

therefore, entitled to an entry of summary judgment on this claim.

3.      Misconduct Charge

Mincy alleges that he was issued a retaliatory misconduct for the engaging in

the above-specified protected conduct.  Allegations of being falsely charged with

misconduct in retaliation for filing a grievance generally satisfy the "adverse action"

requirement.  See Smith v. Mensinger, 293 F.3d 641, 653 (3d Cir. 2002) (finding that

falsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment).

However, Mincy fails to establish a causal link between the protected conduct and the issuance of the misconduct or the mishap concerning his witness form. There is no evidence of record that the officer that issued the misconduct, defendant Breiner, or the officers who handled the witness form, defendants Vance and Murphy, had any knowledge of the letters Mincy sent. Nor is there any evidence that they were aware that he filed a grievance challenging the move to the RHU. As with the above claim, in the absence of evidence that the letters and the grievance were somehow connected to Breiner's decision to issue a misconduct, defendants are entitled to an entry of summary judgment on this claim.

Mincy fares no better in relying on the temporal proximity between his protected conduct and the adverse action. Temporal proximity may satisfy the causation element of a retaliation claim only when "the timing of the alleged retaliatory action [is] 'unusually suggestive' of retaliatory motive. . . ." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997); see also, Rauser, 241 F.3d at 334. Temporal proximity is not available to Mincy due to the passage of almost two weeks between writing of the letters and the filing of the grievance.

### 4. Denial of RHU Basic Issue

Likewise, Mincy is unable to establish causation with regard to the denial of basic RHU issue. There is simply no evidence which links the temporary denial of personal hygiene items to the protected conduct. The court also notes that the

16

temporary deprivation was *de minimus*.  Defendants are entitled to an entry of summary judgment on this issue.

     5.     Confinement to Psychiatric Observation Cell

Nor is Mincy able to establish causation on this claim.  The record is devoid of any evidence linking the psychiatric observation to protected conduct.  To the contrary, the only reason for this institutional action was Mincy's refusal to eat. The psychiatric observation was a patently appropriate response taken pursuant to a well-reasoned institutional policy.  Summary judgment will be entered in favor of defendants and against plaintiff.

     B.     <u>Fourteenth Amendment Due Process</u>

Mincy's contention that his due process rights were violated in the context of his misconduct hearing requires a determination of whether he had a protected liberty interest and, if so, what process was mandated to protect it.  <u>See</u> <u>Sandin v. Conner</u>, 515 U.S. 472, 484 (1995); <u>Shoats v. Horn</u>, 213 F.3d 140, 143 (3d Cir. 2000). Importantly, due process requirements apply only when the prison's actions impose "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  <u>Sandin</u>, 515 U.S. at 483 (1995).  "[T]he baseline for determining what is "atypical and significant"—the "ordinary incidents of prison life"—is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law."  <u>Griffin v. Vaughn</u>, 112 F.3d 703, 706  (3d Cir. 1997)(quoting <u>Sandin</u>, 515 U.S. at 486).

Confinement in administrative or punitive segregation is insufficient, without more, to establish the kind of "atypical" deprivation of prison life necessary to implicate a liberty interest. <u>Sandin</u>, 515 U.S. at 486; <u>see</u> <u>Griffin</u>, 112 F.3d at 706-07 (finding that fifteen month period of administrative custody did not deprive prisoner of a liberty interest). The disciplinary sanction at issue, sixty days of disciplinary segregation, does not constitute "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Sandin</u>, 515 U.S. at 483. Hence, defendants are entitled to an entry of judgment on Mincy's due process claim.[4] <u>Buckley v. Barlow</u>, 997 F.2d 494 (8th Cir.1993)); <u>Wilson v. Horn</u>, 971 F. Supp. 943, 947 ( E. D. Pa. 1997).

C.    <u>Eighth Amendment</u>

Although the Eighth Amendment prohibition against cruel and unusual punishment demands that prison officials do not house inmates under conditions that deprive them of one or more basic human needs, <u>Helling v. McKinney</u>, 509 U.S. 25, 32, (1993), it does not mandate that prisons be free of discomfort. <u>Hudson v. McMillian</u>, 503 U.S. 1, 9 (1992). "No static test determines whether conditions of confinement are 'cruel and unusual.' These terms must 'draw [their] meaning from the evolving standards of decency that mark the progress of a maturing society.'"

---

[4]Equally unavailing is plaintiff's vague allegation that the defendants obstructed the grievance procedure. (<u>See</u> Doc. 21, pp. 4, ¶ 14). Prisoners do not have a constitutional right to prison grievance procedures. <u>See</u> <u>Jones v. North Carolina Prisoners' Labor Union, Inc.</u>, 433 U. S. 119, 137- 38 (1977); <u>Massey v. Helman</u>, 259 F.3d 641, 647 (7th Cir. 2001) (citing <u>Adams v. Rice</u>, 40 F.3d 72, 75 (4th Cir.1994)

Tillery v. Owens, 719 F. Supp. 1256, 1262 (W.D. Pa. 1989)(citing, Rhodes v. Chapman, 452 U.S. 337, 346 (1981)).  To violate the Eighth Amendment, conditions of confinement must be dangerous, intolerable or shockingly substandard.  See Riley v. Jeffes, 777 F.2d 143, 147 (3d Cir.1985); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 757 (3d Cir.1979).

To sustain an Eighth Amendment claim, the inmate must also show that the person or persons responsible for the conditions of confinement acted with "a sufficiently culpable state of mind."  Wilson v. Seiter, 501 U.S. 294, 298 (1991). Specifically, an inmate must prove that the defendant demonstrated "deliberate indifference" to a serious risk of harm to which the inmate was exposed.  Farmer v. Brennan, 511 U.S. 825, 836-37 (1994); see also Ostrander v. Horn, 145 F. Supp. 2d 614, 620 (M.D.Pa. 2001), aff'd, 49 Fed. Appx. 391 (3d Cir. 2002).  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id.  "The question . . . is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" Farmer, 511 U.S. at 843.

1.    Denial of RHU Basic Issue

Lengthy deprivation of personal hygiene items may constitute a constitutional violation, depending, obviously, upon the extent of the violation and the nature of the items withheld.  For instance, continued deprivation of soap and a toothbrush may rise to the level of a constitutional violation.  See McCray v. Burrell,

516 F.2d 357, 367 (4th Cir.1975) (considering soap and a toothbrush as "essential articles of hygiene").  In determining whether a prisoner has suffered a deprivation, courts may consider the length of time that the prisoner was without the items. Hoptowit v. Ray, 682 F.2d 1237, 1258 (9th Cir.1982) (citing Hutto v. Finney, 437 U.S. 678, 685 (1978))(finding that "[i]n considering whether a prisoner has been deprived of his rights, courts may consider the length of time that the prisoner must go without these benefits. The longer the prisoner is without such benefits, the closer it becomes to being an unwarranted infliction of pain."); see also Castro v. Cheney, No. 97-4983, 1998 WL 767467, at *6 (E.D. Pa. Nov.3, 1998) (Broderick, J.) (quoting Hutto, 437 U.S. at 685).

The court finds that the temporary deprivation of RHU basic issue for the period at issue, a matter of a few days, was not sufficiently serious to rise to the level of a constitutional violation.  See Matthews v. Murphy, No. 90-35458, 1992 WL 33902 at *4 (9th Cir. Feb.25, 1992) (no Eighth Amendment violation where inmate was deprived of towel, toothbrush, toothpaste, and soap for thirty-four days); Harris v. Fleming, 839 F.2d 1232, 1235-36 (7th Cir. 1988) (no constitutional violation where inmate not given soap, toothpaste, or toothbrush for ten days); Castro v. Chesney, No. CIV.A. 97-4983, 1998 WL 767467 (E.D.Pa. Nov. 3, 1998) (finding that the deprivation of towels, soap, a toothbrush or toothpaste for two-day period was not sufficiently serious to rise to the level of a constitutional violation).  The deprivation of these items for such a short period of time, although uncomfortable for Mincy, is not sufficient to constitute a constitutional violation.  See Rhodes v. Chapman, 452

U.S. 337, 347 (1981).  Moreover, it is undisputed that Mincy was eventually given the hygiene items.  Accordingly, defendants motion for summary judgment will be granted as to this claim.

2.      Confinement to Psychiatric Observation Cell

Plaintiff claims Eighth Amendment violations "as a result of being placed in a psychiatric unit in isolation with no clothing other than a vest, no running water and a bare cell other than a cot as a result of his hunger strike."  (Doc. 134, p. 11). The pertinent facts reveal that there simply is no evidence that the defendants acted with deliberate indifference to Mincy's basic human needs while he was in the POC.  Mincy concedes that he was on a hunger strike and that he was  admitted as an inpatient to the infirmary for psychiatric observation on December 1, 2004, because he refused to eat.  He admits that inmates on a hunger strike are placed under psychiatric observation for their own safety and that no clothing, other than a safety vest is allowed.  He further acknowledges that the POC is only equipped with a cot and does not have running water so medical personnel can monitor the fluid intake of the inmate.

Plaintiff's admissions effectively concede that the conditions in the POC were established for Mincy's own safety.  Further, the fact that the POC was without running water is not sufficient to rise to the level of a constitutional violation, especially in light of the fact that Mincy was provided with all meals and fluids while housed in the cell.  See Stewart v. Wright, 1996 WL 665978 at * 1-2 (7th Cir.1996) ("Dry cell conditions such as not being able to flush the toilet or brush

teeth are mere inconveniences . . . [I]t is well settled that conditions which are
temporary and do not result in physical harm are not actionable under the Eighth
Amendment."); Calhoun v. Wagner, 1997 WL 400043 (E.D.Pa. July 14, 1997) (no
constitutional violation where cell was without water for sixty-one hours but inmate
was provided fluids three times a day).  Defendants will be granted summary
judgment on this claim.

## IV.   **Conclusion**

For the reasons set forth above, defendants motion for summary judgment
(Doc. 94) will be granted.  An appropriate order will issue.


     S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:     March 2, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HILTON MINCY,                    :     CIVIL ACTION NO. 1:05-CV-0292
                                 :
              Plaintiff          :     (Judge Conner)
                                 :
        v.                       :
                                 :
KENNETH G. CHMIELEWSKI,          :
et al.,                          :
                                 :
              Defendants         :

## <u>ORDER</u>

AND NOW, this 2nd day of March, 2007, upon consideration of defendants'

motion for summary judgment  (Doc. 94), and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that:

    1.    Defendants' motion(Doc. 94) is GRANTED.

    2.    The Clerk of Court is directed to ENTER JUDGMENT in favor
of defendants and against plaintiff.

    3.    The Clerk of Court is further directed to CLOSE this case.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge